UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE GH STORM CAT, LLC, *et al.*            CIVIL ACTION

NO. 20-3085

SECTION M (2)

## ORDER & REASONS

Before the Court is a motion for partial summary judgment filed by petitioners GH Storm

Cat, LLC and Celsius Shipping ApS (together, "Petitioners").[1] The claimants, Zen-Noh Grain

Corporation ("ZGC" or "Zen-Noh") and its insurers as subrogees (together with ZGC,

"Claimants"), oppose the motion,[2] and Petitioners reply in further support of the motion.[3]  Having

considered the parties' memoranda, the record, and the applicable law, the Court issues this Order

& Reasons denying the motion.

## I.      BACKGROUND

This dispute arises out of an incident that occurred in the morning of November 11, 2020,

after a long night of grain loading and payload shifting operations.  On the evening of November

10, the *M/V GH Storm Cat* ("*Storm Cat*") berthed at ZGC's grain terminal in Convent, Louisiana,

to load corn.[4]  As part of the loading operation, the *Storm Cat* agreed to provide a crew member to

operate the vessel's cranes to move a small tractor belonging to ZGC to and from the dock and

between the vessel's cargo holds.[5]  The ship's cranes were used to lift the tractor from the dock

---

[1] R. Doc. 53.
[2] R. Doc. 62.
[3] R. Doc. 70.
[4] R. Doc. 53-2 at 1.  The Court notes and concurs with Claimants' hearsay objection to the Incident Investigation Report which forms the basis for some of Petitioners' statement of material facts.  As such, the Court will only credit these portions of the statement to the extent that Claimants admit the relevant facts in their answer to the statement, R. Doc. 62-1 at 2-4, or Petitioners have submitted other summary-judgment evidence in support of such facts.
[5] R. Docs. 53-2 at 1-2; 62-1 at 2, 5.

into one of the vessel's cargo holds, and then from hold to hold, in order to level the cargo that had been loaded.[6]  Crane operations continued intermittently into the early morning hours of November 11, with the crucial operation beginning around nine.[7]  The *Storm Cat* crewman then operating the crane, Dashrath Manharbhai Tandel, commenced lifting the tractor from a cargo hold to place it back on the dock.  He testified that he received a signal from a ZGC stevedore that he was good to lift.[8]  While it is clear from his testimony that he expected the stevedore to act as his signalman, Tandel had no discussion with the stevedore about doing so.[9]  After that signal, says Tandel, the stevedore "just disappeared."[10]  For his part, the stevedore, later identified as Sederic McWilliams, testified that he connected the tractor to the crane from within the cargo hold,[11] but insisted that he gave no signal to confirm the crane was good to lift, and that at no point did he expect to be responsible for signaling to the crane operator.[12]

Whatever the reason, there was no signalman to guide Tandel as he lifted the tractor towards the dock.  Tandel testified that he felt he could not stop the maneuver despite the absence of a signalman because the crane boom was too high and there were other safety considerations in play.[13]  Unfortunately, the tip of the crane then came into contact with the terminal's conveyor gallery, which connected two of the ship loaders, and pierced the sidewall of the gallery.[14]  Out of concern for the structural integrity of the gallery, ZGC initially prevented the *Storm Cat* from extracting the crane boom from the gallery and required the vessel to remain in berth.[15]  The

---

[6] R. Doc. 53-2 at 1-2.
[7] *Id.* at 2.
[8] R. Doc. 53-6 at 9.
[9] R. Doc. 62-6 at 4.
[10] R. Doc. 53-6 at 9.  While the stevedore's presence on the scene was evidently confirmed by video evidence, the stevedore appears to have been out of sight at the crucial moment.  *See id.* at 10.
[11] R. Doc. 62-7 at 3.
[12] *Id.* at 6.
[13] R. Doc. 53-6 at 5.
[14] R. Doc. 53-2 at 3.
[15] R. Doc. 62-4 at 6.

following day (November 12), the crane was dislodged from the gallery when the wake of a passing vessel caused the *Storm Cat* to move in its berth.[16]  Nonetheless, ZGC did not allow the *Storm Cat* to leave the berth until the next day (November 13), again out of concern for the structural integrity of the gallery.[17]  None of the terminal's ship loaders was damaged and ZGC did not lose any grain product as a result of the incident, but the loaders were rendered unavailable.[18]  After the *Storm Cat* left the berth, ZGC commenced repairs.  By November 15, three of the four ship loaders at the terminal were again in operation.[19]  The fourth was fully operational on November 17.[20]

At the time of the incident, the relationship between the parties was governed by a tariff, Dock Tariff No. 7.  Among other things, the tariff provides that "[t]he vessel and its owners, charterers, operators and agents shall be liable for the cost of restoration, replacement and repair for damage to or destruction of Terminal property or equipment caused by any User, and for any loss of revenue to ZGC caused thereby."[21]  The tariff also provides that "ZGC shall … have all remedies available at law, in equity and/or under maritime, federal or state law to collect charges, damages, liquidated damages and indemnities."[22]  Under the tariff, vessels which fail to vacate a berth within one hour of completion of loading "for any reason whatsoever" are subject to "a charge of $7,500.00 for each hour, or fraction thereof, that the vessel remains in berth."[23]

---

[16] R. Doc. 53-2 at 3.
[17] R. Doc. 62-4 at 7.
[18] R. Doc. 53-2 at 3.
[19] R. Doc. 62-14 at 5.
[20] *Id.*
[21] R. Doc. 53-8 at 3.  This provision is titled "vessel liability."
[22] *Id.* at 4.  This provision is titled "remedies for enforcement of tariff."
[23] *Id.* at 9.  This provision is titled "continuous nature of liquidated damages for delay."  The tariff contains several other provisions for liquidated damages relating to a vessel's delay in vacating a berth for various reasons.  *Id.* at 6-9.

The day after the incident, ZGC filed suit against the *Storm Cat* and its owners for damages relating to the incident and sought and obtained an arrest warrant against the vessel.[24]  The vessel owners then filed a complaint for exoneration from or limitation of liability.[25]  Claimants assert maritime tort and contract claims, seeking damages in the amount of $460,957 for property damage, $16,778,853 for "extra expenses," and $2,773,038 for "business interruption."[26]

## II.    PENDING MOTION

Petitioners move for summary judgment on the grounds that the tariff precludes recovery of all but a fraction of the Claimants' losses.  They submit that the published tariff "specifie[s] the remedy if Petitioners damaged Zen-Noh's equipment as 'the cost of restoration, replacement and repair for damage to or destruction of Terminal property or equipment caused by any User, and for any loss of revenue to ZGC caused thereby.'"[27]  These categories of recoverable damages, Petitioners suggest, do not include most of the damages asserted by Claimants.  Moreover, Petitioners submit that "[i]t is Hornbook law that when a contract specifies the remedy for its breach, the claimant cannot seek more than what the contract allows."[28]  As such, Petitioners argue that the recoverable losses should be limited to the cost of repair and any lost revenue, and that even the lost revenue should be limited to the liquidated damages specified in the tariff.[29]

Alternatively, Petitioners maintain that the economic damages sought by Claimants were unforeseeable as a matter of law.  "[T]he key issue to be decided by this Court," they submit, "is whether a shipowner … could have reasonably anticipated that if it caused limited physical damage to the terminal, it was *probable* that the terminal owner would claim $4-5 million per day in alleged

---

[24] *See Zen-Noh Grain Corp. v. M/V GH Storm Cat*, No. 20-3081 (E.D. La. filed Nov. 12, 2020).
[25] R. Doc. 1.
[26] R. Docs. 53-13 at 1-2; 53-14 at 2.
[27] R. Doc. 53-13 at 12 (quoting the tariff).
[28] *Id.* at 11.
[29] *Id.* at 14.  Petitioners offer that the sum of liquidated damages at $7,500 per hour, as provided in the tariff, can total just $180,000 per day.

4

losses in its distinct capacity as a commodities trader, rather than as the operator of the damaged loading terminal."[30]  Petitioners' foreseeability argument consists of three main prongs.  First, they propose that the language of the tariff is a reasonable basis for foreseeability.[31]  As the language of the tariff does not indicate that Petitioners could be liable for the vast damages now levied against them (and, they suggest, implies the opposite), they argue that the damages were not foreseeable as a matter of law.  Second, Petitioners present expert testimony to the effect that a reasonable shipowner would not expect this sort of liability to attach to this kind of incident, largely because, in the expert's opinion, the losses "deriv[ed] from [ZGC's] trading of grain products, as opposed to losses of revenues from terminal operations."[32]  Third, Petitioners assert that trading losses ought not be considered foreseeable due to the "serious implications for the shipping industry" that would result.[33]

In opposition, Claimants contend that Petitioners' motion rests on the mistaken premise that ZGC suffered its losses as a commodities trader, not as a terminal operator, whereas "purchasing and selling commodities (such as grain and soybeans) is the principal and most important component of the Terminal's operations."[34]  Claimants submit that Petitioners have misread the tariff in several ways – first, by reading "loss of revenue" to exclude mitigation expenses; second, by reading the "vessel liability" or damages clause in isolation from rather than in harmony with the rest of the contract; and, third, by applying the "liquidated damages" provision to a scenario involving physical damage.[35]  In response to Petitioner's foreseeability contentions, Claimants assert that the tariff does not preclude their maritime law tort claim, and that reasonable

---

[30] *Id.* at 16 (emphasis in original).
[31] *Id.* at 17-18.
[32] *Id.* at 19.
[33] *Id.* at 23.
[34] R. Doc. 62-14 at 7.
[35] *Id.* at 14-17.

mitigation costs are recoverable.   They present alternative expert testimony to suggest that reasonable shipowners should expect that damages of this sort could be possible in the event of physical damage to a grain terminal.[36]  Claimants then proceed to describe the "direct" connections between the terminal's physical damage and the costs ZGC incurred, reviewing relevant case law.[37]

In reply, Petitioners reassert their position on the language of the tariff, contending that "Claimants try to distort the plain meaning of 'revenue' by equating 'extra expense' with 'lost revenue,' 'revenue losses,' or 'costs to mitigate revenue losses.'"[38]  They also note that the liquidated damages provision in the tariff is, by its terms, not limited to situations in which no physical damage occurred.[39]  Finally, Petitioners contend that the foreseeability analysis turns on whether or not "a shipowner not itself in the grain trading business [could] reasonably foresee that a grain company … would … purchase new corn and soybeans from competitors at extremely disadvantageous prices rather than wait a few days until it could load its own corn and soybeans at its own terminal onto the scheduled vessels."[40]

## III.   LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates

---

[36] *Id.* at 19.
[37] *Id.* at 19-24.
[38] R. Doc. 70 at 3.
[39] *Id.* at 7.
[40] *Id.* at 8-9.

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*.  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323.  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The substantive law identifies which facts are material. *Id*.  Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014).  Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).  In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008).  Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).  Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.[41]

## B.  Interpretation of the Tariff

There are two questions arising out of the tariff: first, what kinds of damages are recoverable under the terms of the tariff, and second, whether the tariff limits the recovery of those enumerated damages. By its terms (specifically, the "vessel liability" provision), the tariff permits recovery "for the cost of restoration, replacement and repair for damage to or destruction of Terminal property or equipment caused by any User, and for any loss of revenue to ZGC caused thereby."[42] Petitioners contend that the extra expenses and business interruption costs sought by

---

[41] Additionally, as this case is set for a bench trial, if the "'the evidentiary facts are not disputed' and 'there are no issues of witness credibility,'" *Manson Gulf, L.L.C. v. Modern Am. Recycling Serv.*, 878 F.3d 130, 134 (5th Cir. 2017) (quoting *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1123-24 (5th Cir. 1978)), the Court "has somewhat greater discretion to consider what weight it will accord the evidence." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quotation omitted).

[42] R. Doc. 53-8 at 3.

Claimants are not recoverable under the terms of the tariff.  The "extra expenses" in question consist of $11,472,195 in replacement grain purchases/sales,[43] $244,737 in barge movement costs,[44] and $5,061,921 in incremental demurrage,[45] while the "business interruption" costs consist of $1,340,376 in replacement soybean purchases to fulfill a "swap" contract and $1,432,662 in "lost elevator income."[46]  Of those costs, Petitioners admit that the last is recoverable by the terms of the tariff.[47]  However, they contend that the remaining $18,000,000 or so is not recoverable under the tariff because such expenses do not fit within the ordinary definition of "loss of revenue."  After all, say Petitioners, the largest share of these expenses consists of ZGC's trading losses associated with grain transactions it entered due to the incident, rather than lost revenue.

Claimants, however, assert that the expenses ought to be understood as lost revenue (or, at least, as mitigation expenses incurred to avoid lost revenue) when placed in context.  They submit that they had six contracts scheduled for fulfillment at the time of the incident and that those six contracts would have generated $132,000,000 in revenue.[48]  ZGC claims that it conducted mitigation efforts swiftly to meet each of these contracts on time and did so, ensuring that none of that $132,000,000 in revenue was lost.[49]  In order to fulfill the contracts without the use of its own loader, ZGC purchased grain from competitors, paid third parties to help "stage, move, restage and

---

[43] ZGC purchased grain from other sources to meet the requirements of six contracts that would have been fulfilled by grain set to be loaded onto vessels at ZGC's Convent terminal between November 11 and 16, 2020, but which could not be loaded due to the accident.  Thereafter, ZGC sold to other customers the grain at the terminal that would have been loaded onto the vessels to fulfill the six contracts.  R. Doc. 62-1 at 8.  The difference between these two amounts was an $11,472,195 loss to ZGC.  R. Doc. 62-14 at 21.

[44] R. Doc. 62-14 at 21.  ZGC incurred these additional costs in moving the barges, which were intended for delivery at its Convent terminal during the unanticipated downtime, to competitor facilities to meet other contract obligations.  *Id.* at 20; R. Doc. 62-1 at 8.

[45] R. Doc. 62-14 at 21-22.  ZGC incurred such demurrage because barges and other vessels could not be released from the Convent terminal within the allotted contract time.  *Id.*; R. Doc. 62-1 at 8.

[46] R. Doc. 62-1 at 6.

[47] R. Doc. 53-13 at 8.  Petitioners reserve, though, their right to dispute the reasonableness of the loss figure.  Nor do Petitioners dispute that damages for the property casualty are recoverable.

[48] R. Doc. 62-16 at 5.  The "swap" contract was not one of these six contracts.

[49] *Id.* at 6.

deliver barges containing the commodities to alternative locations," and incurred costs associated with delays in moving barges.[50]  These expenses, ZGC submits, should all be recoverable as mitigation damages because, but for these efforts, it would have incurred as much as $132,000,000 in lost revenue.

Petitioners counter that the tariff provides for recovery of lost revenue, not lost profit.  ZGC received all $132,000,000 in scheduled revenue, so, reason Petitioners, ZGC is not entitled under the contract to recover as damages the additional amount it had to expend to preserve the scheduled revenue because this amounts to lost profit.

Petitioners' reading of the tariff is too narrow as it disregards another of the tariff's provisions and the ordinary remedies typically available to an aggrieved party under a contract. Thus, the tariff's "remedies" provision expressly states that "ZGC shall … have all remedies available at law, in equity and/or under maritime, federal or state law to collect charges, damages, liquidated damages and indemnities."[51]  In cases such as this, where a vessel has caused physical damage to property, remedies available to an injured party include the right to recover damages for its mitigation expenses, whether the claim is viewed as one involving a maritime contract or a maritime tort.  *See, e.g., Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995, 1003 n.23 (5th Cir. 1984) ("[A] vessel owner is required to mitigate damages and may not recover damages for losses resulting from the owner's failure to use reasonable measures to halt the progress of damage."); *Domar Ocean Transp., Ltd., v. Indep. Ref. Co.*, 783 F.2d 1185, 1191 (5th Cir. 1986) ("Sums reasonably expended in mitigating damages are recoverable against the

---

[50] R. Doc. 62-14 at 8-9.  With respect to the "swap" contract, ZGC states that the $1.3 million cost identified as lost margin on soybeans relates to a planned transaction involving a competitor whereby the $1.3 million would have been repaid upon the loading of a competitor's vessel.  As that vessel could not be loaded, ZGC lost the $1.3 million.

[51] R. Doc. 53-8 at 4.

defendant's cost in judgment in a tort action."); *Grupo HGM Tecnologias Submarina, S.A. v. Energy Subsea, LLC,* 566 F. Supp. 3d 1219, 1234-35 (S.D. Ala. 2021) (allowing recovery of mitigation expenses in a breach-of-maritime-contract case). Here, such mitigation expenses would include ZGC's costs in arranging alternatives to the *Storm Cat*'s required performance under the tariff – that is, the loading of grain required, in turn, for ZGC to perform under its six other contracts.

Petitioners suggest that this reading of the tariff "contravenes two … basic rules of contract interpretation."[52]  First, Petitioners assert that reading the tariff to permit recovery of ZGC's extra expenses as mitigation damages would render meaningless the provision of the tariff that limits the recovery of damages to the cost of repairs and loss of revenue.  In other words, reading the "remedies" provision to permit such recovery renders meaningless the "vessel liability" provision's enumeration of recoverable damages as any loss of revenue and costs of repair caused by physical damage.  Second, Petitioners invoke the "fundamental axiom of contract interpretation that specific provisions control general provisions."  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 377 (5th Cir. 2002).  In this case, say Petitioners, the specific provision regarding recovery in the event of physical damage controls the broader provision concerning available remedies.

The Court disagrees.  The "vessel liability" provision can be, and should be, read in harmony with the "remedies" provision, not in conflict and not as a controlling specific provision. "Maritime contracts must be construed like any other contracts," *CITGO Asphalt Ref. Co. v. Frescati Shipping Co.,* 140 S. Ct. 1081, 1087 (2020), including "interpret[ing], to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous."

---

[52] R. Doc. 70 at 5.

*Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004). "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. Reading the relevant tariff provisions in harmony and as complementary, the enumerated language of the "vessel liability" provision certainly limits damages for the terminal's physical damage to costs of repair and loss of revenue. But the "remedies" provision preserves to Claimants the right to seek recovery of these damages by pursuing the ordinary remedies available for maritime claims, including the right to recover mitigation expenses incurred to avoid a loss of revenue or additional costs of repair. Significantly, the interpretation proposed by Petitioners (which requires that these provisions be construed as in conflict) would lead to the anomalous scenario of allowing ZGC to recover from Petitioners all $132,000,000 in lost revenue had it not attempted to mitigate its losses but foreclosing ZGC from recovering the much smaller sum of mitigation expenses incurred to preserve that revenue.

Petitioners argue further that a post-incident addition to the tariff's language, expressly allowing ZGC to recover "extra expense incurred by ZGC to continue as nearly normal as practicable the conduct of ZGC's business,"[53] means that the right to recover mitigation expenses as damages could not have been permitted under the tariff's provisions in place at the time of the incident. However, the post-incident addition does not alter this Court's reading of the pre-incident contract language. Even if the language were intended to make clearer ZGC's right to recover extra expenses due to mitigation efforts, it does not negate the tariff's pre-incident language affording ZGC the right to recover such expenses. Notably, though, the post-incident language can be read to give ZGC the right to recover extra expenses above and beyond those attributable

---

[53] R. Doc. 53-9 at 3.

to mitigation efforts.  Hence, the post-incident addition cannot be used to require that the tariff's pre-incident provisions be read to bar the recovery of mitigation expenses.

Petitioners also suggest that the liquidated damages provision of the tariff applies to cap Claimants' potential recovery at $180,000 per day.  In relevant part, the tariff provides that a vessel which fails to vacate its berth within one hour of completion of loading "for any reason whatsoever" is subject to "a charge of $7,500.00 for each hour, or fraction thereof, that the vessel remains in berth."[54]  Putting to one side whether or not loading was complete at the time of the incident, the Court is not convinced that the liquidated damages provision applies to this situation. First, the tariff gives no indication that the liquidated damages it provides were intended to serve as a proxy for damages for physical harm to the terminal caused by a vessel using the terminal. Instead, each liquidated damages provision in the tariff (and there are several) relates to relatively routine instances of delay in a vessel's leaving its berth, not a maritime casualty involving physical damage to the terminal.  Second, the provision in question states that "assessment of liquidated damages shall not preclude ZGC from ordering the vessel to vacate the berth at the vessel's own expense."[55]  The delay that prevented the *Storm Cat* from leaving its berth was not the vessel's choice but ZGC's, guided by its desire to prevent the possibility of additional physical damage to its terminal, particularly, the gallery.  Had the *Storm Cat* failed to vacate the berth once commanded to do so, liquidated damages could then be assessed against it.[56]  But the clause cannot be read to allow ZGC to hold a vessel in berth "for any reason whatsoever" simply to ratchet up the total of liquidated damages it could then demand.  Under the circumstances of this case, then,

---

[54] R. Doc. 53-8 at 9.
[55] *Id.*
[56] *See id.* at 8 ("Vessel, its owner(s), operator(s), charterer(s) and agent(s) shall be subject to a charge of $7,500.00 for each hour, or fraction thereof, of delay caused by vessel's failure to comply with directions or maintain continuous readiness.").

liquidated damages would not be available to ZGC, and therefore likewise cannot be used to limit ZGC's recovery.[57]

### C.  Foreseeability Analysis

Alternatively, Petitioners assert that Claimants cannot recover the challenged damages because they were unforeseeable.  "In the context of maritime torts, … harm [is] a foreseeable consequence of an act or omission 'if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.'"  *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987)).  A party's duty in maritime torts "may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct, and not to other interests even of the same plaintiff which may in fact happen to be injured."  *Consolidated Aluminum*, 833 F.2d at 67 (quotation omitted).  Foreseeability attaches to "the 'natural and probable' risks that a reasonable person would likely take into account in guiding her practical conduct."  *In re Signal Int'l LLC*, 579 F.3d 478, 491-92 (5th Cir. 2009).

There is no dispute that claims for damages relating to "repair costs and lost terminal income from dockage, stevedoring, line handling, etc." are foreseeable;[58] the connection between physical damage and those immediate damages is direct and obvious.  At dispute, Petitioners submit, is "the massive grain trading losses that Zen-Noh claims it suffered in its distinct capacity

---

[57] In any case, the Court does not believe that liquidated damages would limit ZGC's ability to recover.  The Petitioners cite an Eighth Circuit case for the proposition that, "where the parties especially provide or stipulate for liquidated damages, such liquidated damages take the place of any actual damages suffered and that any recovery for breach is limited to the amount so agreed upon."  *Trans World Airlines, Inc. v. Travelers Indem. Co.*, 262 F.2d 321, 325 (8th Cir. 1959).  That case, which relies on Missouri law, is not binding on this Court, but in any event, it applies only where the contract expressly provides for liquidated damages in a broader range of circumstances than does the tariff here, which limits liquidated damages to instances of a vessel's delay, generally, due to its failure to maintain "continuous readiness."

[58] R. Doc. 53-13 at 16.

as a commodities trader."[59]  The chief operating officer of one of the Petitioners declares that he has "never heard of a grain elevator or other terminal owner/operator claiming the type or amount of trading loss damages that Zen-Noh claims in this case," and that if that potential liability had been known ahead of time, "trading to this terminal would have been excluded" in the ship's charter.[60]  Petitioners also submit expert testimony to the effect that "[s]uch trading losses were not of a type or of a size that an experienced shipowner could reasonably have expected to flow from the physical damage that took place when the ship's crane came into contact with the terminal loading equipment."[61]  The disputed losses, Petitioners contend, "are largely a product of the grain trading markets and the sale contracts Zen-Noh had pending at the time of the incident," and therefore are not foreseeable as "the average shipowner would have no knowledge of the market forces that determine the prices of bulk soybeans and corn for export at any given time."[62]

The question, though, is not whether a shipowner could have foreseen the size of the damages but rather whether it could have foreseen the "general sort" of damages that could be incurred.  *Great Lakes Dredge,* 624 F.3d at 211; *Consolidated Aluminum*, 833 F.2d at 68.  The general sort of damages in this case are mitigation damages, which are recoverable in actions such as this.[63]  It is entirely foreseeable that a company would engage in mitigation efforts to maintain its contractual obligations to other customers.  The scale of these efforts may have been surprising to Petitioners, but not the type.  Had ZGC's loader been unable to load Petitioners' grain due to negligence on ZGC's side, would Petitioners not have likewise sought to mitigate their losses?  Petitioners may not have known that ZGC had $132,000,000 in contracts scheduled for fulfillment

---

[59] *Id.*
[60] R. Doc. 53-10 at 3.
[61] R. Doc. 53-17 at 11.
[62] R. Doc. 53-13 at 20.
[63] *See supra* at 10-11.

in the timeframe in question, but they cannot say they were unaware that ZGC had contracts to fulfill, theirs among them. As ZGC points out, terminals "purchase commodities [to fulfill contracts], receive the commodities mostly by barges, and load those commodities on a bulk vessel (like the M/V GH STORM CAT) for delivery."[64] The claimed damages relate directly to the type of activity the *Storm Cat* was engaged in at the time of the incident.

Petitioners also suggest that these specific mitigation expenses were not foreseeable because ZGC did not lose any grain product as a result of the incident. ZGC had some $585,000,000 worth of grain ready or nearly ready to be loaded in the elevator at the time of the incident.[65] Petitioners contend that ZGC's decision to "purchase new corn and soybeans from competitors at extremely disadvantageous prices rather than wait a few days until it could load its own corn and soybeans at its own terminal onto the scheduled vessels" was not foreseeable to any reasonable shipowner.[66] This may go to the reasonableness of the mitigation expenses, but it does not speak to their foreseeability. Again, it is foreseeable that a company would attempt to mitigate its losses by attempting to fulfill its contracts by any means of less expense than the value of the contracts. Moreover, had ZGC not purchased additional grain from outside sources and instead defaulted on its pending contracts, the claims it might then assert against these same Petitioners could have been far greater.

Nor are the cases Petitioners cite applicable to these circumstances. The first, *Republic of France v. United States*, 290 F.2d 395 (5th Cir. 1961), involved a vessel that exploded while loading fertilizer, causing a tremendous number of deaths and a great deal of destruction. The

---

[64] R. Doc. 62-14 at 7. Notably, ZGC has a division called Zen-Noh Grain Trading ("ZGT") that "speculatively trades commodity futures without any expectation of taking physical delivery" of the commodity. *Id.* at n.29. Claimants make no claim for losses associated with ZGT in this lawsuit, R. Doc. 62-10 at 3-4, and indeed such losses would not have been foreseeable.

[65] R. Doc. 62-10 at 4.

[66] R. Doc. 70 at 9.

16

court, applying Texas law, held that the explosion was unforeseeable because "the force and devastating effects of this explosion shocked and surprised the scientific field as well as the transportation industry." *Id.* at 400. Here, there is no such shock – ZGC's business model of purchasing and loading grain to fulfill contracts is arguably general knowledge; at the very least, there is a material dispute of fact as to this knowledge given the competing claims of the parties' experts.[67] Petitioners likewise cite *Consolidated Aluminum*, in which the court found that damages resulting from "failure to follow safe dredging practices" would not have foreseeably "result[ed] in physical damage to the equipment and work-in-progress at Consolidated's aluminum reduction plant several miles away." *Consolidated Aluminum*, 833 F.2d at 68. There, the damage at the plant was not the direct result of the dredging issues but resulted from a knock-on effect when Texaco shut off the plant's supply of natural gas to halt the escape of natural gas from Texaco's pipelines. *Id.* at 66. The court held that the damage to the aluminum plant, which arose "from the loss of natural gas supply, in turn causing the shut down of electric turbines, in turn causing a loss of electric power …, with the ultimate result being substantial damage to equipment and product-in-process, goes beyond the pale of general harm which reasonably might have been anticipated." *Id.* at 68. Here, the chain of events is not nearly so attenuated. ZGC's terminal was allegedly rendered inoperable by the damage caused by the *Storm Cat*. As a result, ZGC sought other means to fulfill its contracts that it had intended to fulfill by making use of its own loader. ZGC is not, as Consolidated Aluminum was, a third party seeking damages which resulted from the actions of a directly damaged entity (in *Consolidated Aluminum*, Texaco). ZGC was directly harmed. Finally, as Petitioners note, the Supreme Court's decision in *Robins Dry Dock & Repair Co. v.*

---

[67] Petitioners submit that the foreseeability opinions of Claimants' expert are "self-evidently conclusory and unsupported by any specific facts," and that the Court should therefore ignore them as inadmissible. *Id.* The Court disagrees. The expert's qualifications and credibility are open to dispute, but his opinions on the nature of terminal operations appear to be based on his experience. *See generally* R. Doc. 62-17.

*Flint*, 275 U.S. 303 (1927), does not prevent recovery of economic damages when physical damage is present.  To the extent that ZGC's mitigation expenses are demonstrated to be unreasonable, Petitioners can still challenge them; "a showing of physical damage to a proprietary interest does not automatically 'open the door to all foreseeable economic consequences'…. The benchmark for this Court is reasonableness."  *Am. River Transp. Co. v. Morton Int'l, Inc.*, 2008 WL 2436280, at *4 (E.D. La. June 13, 2008) (quoting *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.,* 71 F.3d 198, 202 (5th Cir. 1995)).  Again, however, this principle does not go to foreseeability.

Finally, Petitioners' own purported policy suggests that these kinds of damages may have been foreseeable.  Petitioners assert that if the scope of potential liability had been known ahead of time, "trading to this terminal would have been excluded."[68]  But the issue was not trading as such so much as it was the use and alleged misuse of the crane.  Damage of this kind would not have occurred in ordinary loading exercises, and in deposition one of Petitioners' employees stated that "none of the crew members are supposed to use the crane for cargo operations."[69]  The use of the crane was out of the ordinary and appears to have been in contravention of regular *Storm Cat* policy.  The danger of this kind of physical damage was certainly in mind in the creation and general enforcement of this policy.  In sum, these mitigation expenses were of the kind that a reasonable shipowner could have expected in the event of an accident which caused physical damage to a loader.  It remains to be decided whether the damage was as substantial as ZGC claims it was, and it remains to be determined whether the mitigation expenses were reasonable.  But they were at the very least foreseeable.[70]  Summary judgment is therefore not appropriate at this stage.

---

[68] R. Doc. 53-10 at 3.

[69] R. Doc. 62-5 at 5.

[70] The Court credits Petitioner's claim that the tariff did not put them on notice of these potential damages. But, for much the same reasons as were discussed in the section in which the tariff was interpreted, the Court does not

IV.     **CONCLUSION**

Accordingly, for the foregoing reasons,

IT IS ORDERED that the Petitioner's motion for partial summary judgment (R. Doc. 53)

is DENIED.

New Orleans, Louisiana, this 5th day of August, 2022.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

agree that the tariff's language – or the changes thereto following the incident – suggests that the damages were
unforeseeable.